MOORE v. BANK.

(Filed December 15, 1905).

*Malicious Prosecution—Probable Cause—Question for Court*
*—Evidence—Attachment.*

1. In an action for malicious prosecution in suing out, an attachment, justifiable probable cause is a belief by the attaching creditor, in the existence of facts essential to the prosecution of his attachment founded upon such circumstances as supposing him to be a man of ordinary caution, prudence and judgment, were sufficient to. induce such belief.

2. When the facts are admitted, it is the duty of the court to declare, as a question of law, whether there is probable cause.

3. Those facts and circumstances alone which were known to defendant at the time of the affidavit upon which the warrant of attachment was based are to be considered in determining the question whether he had probable cause.

4. Evidence that plaintiff was indebted to defendant bank in a large amount which was unsecured and had been running for a long time, and though urged to do so, plaintiff had made no payment thereon; that he had withdrawn his account from the bank; that the bank knew of plaintiff's litigation with his wife and its disastrous effect upon his business and property, plaintiff having informed the bank that he owed $20,000 and had property enough to pay for it, "but he feared such would not be the case long;" that his property was encumbered with mortgages for $5,000.00 and with an inchoate dower right and a pending claim for alimony for $4,000.00; that plaintiff had sold nearly all of his personal property, had dismantled and shut down his mill, leased his store for two years, left the entire property uninsured and had gone to a distant State, *held*, that these facts constituted probable cause for attaching plaintiff's property.

5. The fact that the plaintiff owned a large quantity of real estate of large value is not material upon the question of probable cause.

ACTION by J. H. Moore against the First National Bank of Statesville and Geo. H. Brown, heard by *Judge Jas. L.*

*Webb* and a jury, at the February Term, 1905, of the Superior Court of ALEXANDER.

This was an action for damages alleged to have been sustained by reason of suing out an attachment by defendant bank and George H. Brown, its cashier, against plaintiff's property, wrongfully, maliciously and without probable cause. A demurrer to the plaintiff's evidence was sustained by the court and the action dismissed. The facts developed upon plaintiff's evidence, in so far as they are material to the decision of the appeal, are: The defendant bank is a banking association duly organized pursuant to the National Banking Laws and was, at and before the date of the transactions set out in the complaint, engaged in the banking business in the city of Statesville. The defendant Brown was, at said dates, cashier of said bank, charged with the duties incident to his office. Plaintiff was, on the 5th day of June, 1903, and had been for some time prior thereto, indebted to defendant bank in the sum of five thousand, one hundred dollars—said indebtedness was evidenced by several notes executed at different dates during the year 1901, and two notes during 1902, some of said notes running thirty days and some ninety days. Interest had been paid from time to time. Several of them were overdue on June 5, 1903. The defendant bank had no security to the said indebtedness. The bank had, during the year 1903, frequently urged the payment of the notes, but no payment had been made on them. Plaintiff was in June, 1903, a resident of Liledoun, Alexander County. He was a physician, but was, at the date of the transactions referred to, engaged in operating a cotton mill, flour mill and farming, etc., conducting a store in connection with his mills. He owned June 5, 1903, a roller flour mill and corn mill at Hickory in Catawba County, known as the Allspaugh Mills, also the Allspaugh Farm of 287 acres, worth in all $8,000. He owned at Liledoun a cotton mill and other real estate, estimated to be worth

$45,000. There was a mortgage on the Alexander property of about $2,500. He owned the Watts Farm of 350 acres, upon which there was a mortgage of $2,500 for the purchase money. According to plaintiff's estimate, his property was worth at a forced sale, $53,000, and his indebtedness was $20,000. He was involved in a divorce suit with his wife in which she was claiming alimony, and had filed a notice of *lis pendens* in the county of Alexander. There was evidence tending to show that plaintiff owned property in Kentucky of considerable value. He had in his mill at Liledoun $10,000 or $12,000 worth of "duck goods," the product of his mill, which he had sold and for which he had received New York exchange. Prior to June, 1903, plaintiff had kept an account, depositing large sums of money, in defendant bank, but had ceased to do so during the month of April, 1903, after which time the deposits did not amount to much. He was on June 5, 1903, solvent.

Plaintiff's litigation with his wife was giving him anxiety and annoyance. Motion was pending for further alimony *pendente lite,* $4,000 having been allowed and paid. The reason assigned by plaintiff for ceasing to keep his account with defendant bank was the fact that the attorney for the bank had been employed by his wife in her suit with him and that he did not deem it safe to have his business known to them. On May 21, 1903, plaintiff sent to defendant Brown, cashier, a letter in which he stated that he felt he owed a duty to his creditors, he being one of them, to make a plain statement concerning his business and to afford him the means of realizing the amount of his debt in full. That he, Brown, had trusted him and he did not propose that he should lose a cent by reason of his confidence. That if he would take the prompt action as he, plaintiff, suggested, he would sustain no loss. That prior to two years before this, his business was on a firm basis and he was making money; that his obligations were met promptly and he looked forward with

hope to a successful business future. That, at that time, his wife, from whom he had separated several years before, had returned from California and instituted suit against him on groundless charges. That he had been harassed by motions for alimony *pendente lite;* had paid her $4,000 besides cost and attorney's fees—that he had been unable to procure a trial of the case and had exhausted every effort to obtain a reasonable settlement; that he had no assurance when the cause would be tried. Meanwhile she was clamoring for more alimony and that costs and expenses were accumulating. That after July 1 another motion for alimony could be made and he had no doubt that it would be; that it might result in another heavy financial loss to him; that he had lost heavily in sums actually paid out; that he had not been able to give to his business the proper attention. That he was indebted to the amount of $20,000 and had property enough to make every obligation good, saying: "But with the continuance of this suit, its heavy demands upon my time and resources, its disturbing and harassing influence upon my mind, I fear that such will not be the case long." He stated that he wished to protect his creditors while he had the means with which to do so. That he did not wish to enter bankruptcy, because he was not a bankrupt; if he left his creditors to sue, obtain judgment and levy execution and resort to other process the assets would be consumed in court, etc. He proceeded to make a proposition to convey his property to two trustees, one selected by himself and one by his creditors—both to give bond, etc., to sell and pay his creditors. He requests the defendant to act promptly in the matter signifying acceptance and taking the steps necessary to carry into effect his proposition. This letter was sent by plaintiff to his other creditors who were willing to accept his proposition. Sometime during the months of February and March, 1903, plaintiff sold some horses, mules and cattle—he sold other stock in May, and on the 18th day of said month sold

his stock of goods for $3,300, for which he received $2,000 cash and notes for balance—leased his store house for two years—sold his growing crop of cotton on hand and shut down his mill.    On or about May 26, 1903, plaintiff left his home and went to the city of Cincinnati for the purpose of attending the sale of some property belonging to his children. He stated in Sunday school that he was going and would be away some two or three weeks.    He caused to be sent to his nephew, Mr. Payne, in Cincinnati, from the proceeds of his property sold, about $8,000, which was deposited in bank to his, Payne's, credit.    This was not known to Brown on June 5, 1903.    There was much testimony in regard to plaintiff's property and his movements subsequent to the issuing of the attachment.

Plaintiff introduced his son, Ernest V. Moore, who testified that he saw defendant Brown at Taylorsville two days prior to the date of the attachment.    He testified as follows in regard to conversation with defendant: "I came up on the train from Statesville—had been to Hickory; I got into a buggy; was about to drive away when I saw Mr. Brown.    I had the buggy stopped—Mr. Brown spoke to me and shook hands with me, and made some remark—asked where my father was; told him that my father was out of town, and he made the remark that he wished to see me.    I got out of the buggy and went back to the Campbell boarding house; Mr. Brown asked me again, I think, where my father was, and I told him he was in Cincinnati; he told me that a report had come to him of the sale of certain property; I told him that Mr. Deal could give him all the information regarding that property, and that he could see him at the mill.    We secured a buggy and, at his request, drove to the mill, about three miles; on our way out we talked about the situation; he explained that the money had been loaned by the bank, and that he was very anxious about it; I told him that I realized that, and also that he need have no anxiety concern-

ing it; that we were immediately expecting a trial of the divorce proceedings then pending; that a special term of court had been ordered by the Governor in Catawba County for the purpose of trying this case, and it would come up in July—first of July, and that the case would then unquestionably be settled; explained to him that he had practically exhausted his credit on the property on account of these divorce proceedings, and that at the present time it was impossible for us to make payment of the notes then due or about to be due; he seemed to be very well satisfied with what I had said, and when he reached the mill he made inquiry concerning the insurance on the property; I told him my impression was it was insured for $40,000; we made search for the policies and found several, but all the policies which we were able to locate were old policies and had been cancelled; Mr. Brown seemed very anxious about it and wished to know definitely about it, and I told him that the only way I could find out was to write my father, which I promised to do and let him know immediately I heard; he then requested me to take him through the cotton mill; he examined the machinery thoroughly and made notes of some sort, and questioned me as to the price of it; I informed him that the mill originally cost between $40,000 and $50,000, including the machinery; we went entirely through the mill; examined the water power and the engine, and just as we stepped out the mill Mr. Brown said there is no question about this being a good mill; I took him through the roller mill; it cost between $3,500 and $4,000. I offered to take him up about one-half mile above the place to show him the shoal, and he said he did not care to go; we went back into the store; he went and questioned Mr. Deal; I don't know what he said to Mr. Deal; very shortly afterwards we drove back to town. Driving back to Taylorsville he said to me, Why did your father sell the property at Liledoun? I went into this detailed statement, which might have been made

some parts at other times; this was the substance of the statement I made to him at different times on that trip. I stated that for the past two or three years we have been harassed by divorce proceedings; motions for alimony have been made at eight or nine different times; at one time there was a judgment and an order from the Superior Court of this State for $4,000 to be paid in 90 days; an appeal was taken on that order; and there were other matters in the court; at least, my father was threatened with contempt proceedings and threatened with jail for failing to pay it, but the amount was paid; I stated the business here has been dull and all the running capital practically has been withdrawn from the mill to meet the expense of litigation; in addition to this he has bought and paid for, to a great extent, the roller mill in Hickory; which also took a great part of his capital; that capital which I speak of was the running capital of the mill at Liledoun; I explained to him that the litigation had been protracted, but a special term of the court had been ordered, and we were expecting a trial in July and beyond all reasonable doubt a trial would be had; in addition to a trial we were expecting a further motion for alimony, and that the sale of the property had been for the exclusive purpose of obtaining money to meet the expenses of the litigation, and to pay any possible judgment for alimony, and to run his business which was then standing still for lack of funds; Mr. Brown seemed to be satisfied; he had previously stated that he had always been a good friend to this concern; I said that was true; he said that he was my father's friend, and when he said he was he was, and he had no desire in the world to injure him; I told him I believed that; he told me that he knew the attorneys and the plaintiff in the divorce proceedings were doing everything in their power to ruin him, and if possible would ruin him, and in all the trouble that had preceded he had advanced the money with which to run the business, and had done it willingly; he said now he was

anxious and wanted the money back—wanted the debt paid off; I told him that the most earnest desire we had was to pay every obligation we had; every move we made was to protect our creditors; that the sale of such personal property as had been sold was for the purpose of meeting all the requirements of the court in the matter then pending.  After we reached Taylorsville I left him at the bank in conversation with Mr. McIntosh and Mr. Matheson; Mr. Brown was very much concerned because he could see no insurance on the property at Liledoun; I told him, however, that I would look into the matter at once and let him know as soon as I could; he said that he thought Dr. Moore should, for his own protection and the protection of his creditors, keep his property insured; $50,000 of property with not a cent of insurance on it; I may have stated again I would write to my father about it.  While we were at Liledoun Mr. Brown again asked me where my father was; I told him he had gone to Cincinnati and was going to Columbus for a day or so; I said I would be very glad for him to write him about the matter; I took a piece of paper and wrote his address in Cincinnati and in Columbus, telling him I was not certain as to just which place he would be when his letter should arrive; I said if you write duplicate letters to him at these addresses they will be delivered in due course of mail, and gave him the addresses.  I told him further, I will write to him and will let him know immediately I hear from him concerning the insurance; he said when will he be back?  I said, if he is not on his way back he will be here the first of the week; he said, what is he gone for?  I said, to look after some property belonging to us children in Cincinnati; he has an order of court authorizing a sale of this property and has gone for the purpose of trying to effect a sale; he urged me on the matter as to his return, and I repeatedly restated these facts.  I questioned him as to what course he was about to pursue; he made a statement here in Taylorsville just out-

side the Bank of Alexander in the middle of the street just before he went to the train that he had no course in view; nothing to act upon; I said, whatever course you have in view don't take any action until Monday; I said my father will certainly be here Monday; he said, he will certainly return Monday? I said he will undoubtedly return Monday; Mr. Brown smiled and said all right. He returned Monday; I don't recall anything further."

On June 5, 1903, defendant bank instituted an action against plaintiff for the recovery of said indebtedness. For the purpose of obtaining a warrant of attachment, the defendant Brown made an affidavit setting forth the cause of action and averring that plaintiff had sold and disposed of the property described and was then offering for sale other valuable property, "all of which said defendant has done with intent, as affiant is informed and believes, to defraud his creditors." That plaintiff had departed from the State with, as affiant is informed and believes, intent to defraud his creditors. A warrant of attachment was issued upon said affidavit and duly levied by the sheriff of said county upon plaintiff's property on June 6, 1903. Plaintiff, through his counsel, gave notice on July 25, 1903, that he would move the court at a time and place named to dissolve the attachment. At the August Term, 1903, an order was made reciting the said motion and that "the defendant having averred in his answer his willingness and ability to pay off the indebtedness due plaintiff upon dissolution of the attachment, and having exhibited a certified check to the court payable to the plaintiff as evidence of his good faith, it is ordered that the said attachment be dissolved and thereupon said check delivered to the plaintiff." Thereafter an order was made taxing defendant bank with the cost. There was evidence that plaintiff had advertised his property for sale. It is not clear whether defendant Brown had knowledge of this at the time he sued out the attachment. At the close of plaintiff's evidence, defendant moved for judgment

as upon nonsuit.   Motion allowed.   Plaintiff excepted and appealed.

*Armfield & Turner, R. Z. Linney* and *Hufham & Williams* for the plaintiff.

*Furches, Coble & Nicholson* and *W. P. Bynum, Jr.,* for the defendant.

CONNOR, J., after stating the case:   We are relieved of any extended discussion of the principles of law applicable to this appeal.   The learned counsel for plaintiff and defendants agree in that respect.   Plaintiff's counsel cite a line of cases decided by this court which clearly and without any variation settle the law as to the material questions in the case.   We are not called upon to express any opinion in regard to the conduct or motives of plaintiff except in so far as they bear upon the state of defendant's mind and the reasonableness of his belief. It may well be, and we do not wish to be understood as intimating any opinion to the contrary, that he was acting in all that he did, in perfect good faith and with honest intentions. It is evident from his testimony that the long and harassing litigation with his wife had, as it was well calculated to do, seriously disturbed his mind and embarrassed his business.

The question is whether the defendant Brown had probable cause to believe that plaintiff was moved by any other than an honest purpose in his conduct.   The essential averment to be established before the plaintiff can proceed with this suit is the absence of probable cause for defendant's action.   Until he has done this, he cannot call the defendant's motives in question.   This is conceded by his counsel.   What constitutes probable cause?   The answer is given by *Daniel, J.,* in *Cabiness v. Martin,* 14 N. C., 454, quoting *Judge Washington:* "I understand it to be the existence of circumstances and facts, sufficiently strong to excite, in a reasonable mind, suspicion that the person charged with having been guilty was

guilty; it is a case of apparent guilt, as contradistinguished from real guilt. It is not essential that there should be positive evidence at the time the action is commenced; but the guilt should be so apparent at that time as would be sufficient ground to induce a rational and prudent man, who duly regards the rights of others as well as his own, to institute a prosecution." *Smith v. Deaver,* 49 N. C., 513; Jaggard on Torts, 616. "A reasonable or well grounded suspicion of the guilt of the accused, based on circumstances sufficient to justify a reasonable belief thereof in the mind of a cautious and prudent man, is sufficient defense to the action." 19 Am. & Eng. Enc. (2 Ed.), 659. *Stacey v. Emery,* 97 U. S., 642; *Ferguson v. Arnow,* 142 N. Y., 580.

In *Spengler v. Dorry,* 56 Va., 380, the action was for malicious prosecution in suing out an attachment. *Daniel, J.,* referring to *Judge Washington's* definition in *Munns v. Dupont* (cited in *Cabiness v. Martin, supra*), says: "Modifying the definition so as to adapt to such a case as the one before us, we may, I think, properly define justifiable cause, in cases of the kind to be, a belief, by the attaching creditor, in the existence of the facts essential to the prosecution of his attachment founded upon such circumstances as, supposing him to be a man of ordinary caution, prudence and judgment, were sufficient to induce such belief."

It is conceded that when the facts are admitted it is the duty of the court to declare, as a question of law, whether there is probable cause. *Daniel, J.,* in *Swaim v. Stafford,* 25 N. C., 289, says: "What is probable cause when the facts are admitted is a pure question of law." The law has been uniformly so held in this State. In *Beale v. Roberson,* 29 N. C., 280, *Ruffin, C. J.,* after reviewing the English authorities, in connection with our own, says: "It would seem then, that making a question on this subject must be regarded as an attempt to move fixed things, and cannot be successful either in England or here." He also says that however difficult it

may be, it is a question which a judge can deal with better than a jury; as he does with reasonable time, due diligence and legal provocation and the like. *Vickers v. Logan,* 44 N. C., 394; *Jones v. Railroad,* 125 N. C., 227. In *Kirkham v. Coe,* 46 N. C., 423, the judge upon the entire evidence instructed the jury that there was not probable cause. In *Honeycut v. Freeman,* 35 N. C., 320, the court held as matter of law that there was not probable cause. In this case, His Honor in effect instructed the jury that there was probable cause. There was nothing to be submitted to the jury—the defendant admitted every portion of plaintiff's testimony, material to the inquiry, to be true. In ascertaining whether the defendant had probable cause, we are to consider only those facts which were known to him at the time he sued out the attachment. Those facts and circumstances alone which were known to defendant at the time of the affidavit upon which the warrant of attachment was based are to be considered in determining the question whether he had probable cause. *Swaim v. Stafford, supra; Beale v. Roberson, supra.*

The defendant Brown knew that plaintiff was indebted to the bank in a large amount—that the debt was unsecured and had been running a long time, interest being paid. That, although urged to do so, plaintiff had made no payment whatever on the notes; that he had withdrawn his account from the bank. In this connection the reason given for doing so is not material, the withdrawal deprived the bank of any opportunity of keeping up with his cash transactions, knowing the sources from which he was drawing cash and the disposition made of it. He had a right to withdraw his account, if he saw fit, but when he did so, he was bound to know that the bank would not longer extend him credit. The defendant knew of the litigation with his wife and its effect upon his business and property. In the light of these facts, the letter of May 21, 1903, informed the defendant of his condition and his apprehensions in regard to the future of his business. The bank

was under no obligation to accept his proposition, no matter how sincere and honest he was in making it. The defendant Brown must have known that a conveyance of the property encumbered with two mortgages of $5,000—a pending claim for alimony *pendente lit*e reasonably anticipated to be not less than $4,000—secured on the property by a notice of *lis pendens*—with the right to renew the demand—the property further encumbered with an *inchoate* dower right—certainly all of these incumberances rendered the security offered for $20,000 precarious. No prudent person would have loaned so much upon the property with the chances, the almost certainty, of litigation. In this condition of affairs, the defendant Brown goes to Taylorsville, and thence to the mill; he finds that plaintiff has sold very nearly, if not quite, all of his personal property, has dismantled and shut down the mill, leased out the store for two years, left the entire property uninsured, and gone, as his son tells him, to a distant State. It is true that plaintiff's son gives defendant an account of conditions as he understands them, and we take it does so honestly. There is no suggestion of the disposition made of the money for which the property had been sold—his son says because he did not ask. The defendant was not bound to accept the son's explanations of the father's conduct, he could well have concluded that the son himself did not understand the purposes of his father. In this condition of affairs it was certainly the duty of the officers of the bank to take some action looking to the collection of the debt—to have failed in that respect would have subjected them to censure, if not personal liability. No other course than an attachment was open to them. The plaintiff was out of the State, no personal service could be made nor could any injunction have been served on him. The defendant must either have quietly awaited developments and taken the risk of further sales by plaintiff while out of the State, or of his return or of other creditors attaching.

The plaintiff's counsel strongly contend in a well considered brief that the facts which were known to defendant Brown should have assured him that the bank was in no danger of losing the debt; that plaintiff was amply able to pay his debts in full; that he knew why plaintiff had gone to Cincinnati and that he would return on Monday. That while the conditions existing at the time of suing out the warrant might have constituted probable cause for action by some other person, that the same facts did not constitute such cause to justify defendant Brown's action. This is equivalent to saying that Brown swore falsely in his affidavit, that he did not in fact believe that plaintiff was guilty of fraudulent conduct. We are of the opinion that when all of the facts and circumstances known to defendant Brown are taken into consideration, he had probable cause to sue out the warrant. Was there any evidence that in truth he did not honestly believe that to which he swore? But, says the plaintiff, did not plaintiff's son explain his father's absence and when he would return, and did not Brown say that he had the utmost confidence in Dr. Moore—had been his friend and had no ground to take any action? Brown was under no obligation to accept the son's version of his father's conduct, and his action shows that he did not do so. He may not, at the time, have determined upon the course he would pursue to secure the bank's debt. If he had done so, he would hardly have notified the son that he was going to return to Statesville and sue out an attachment. That would not have been the conduct of a prudent man trying to secure a debt of $5,000. It is asked: "Were not the circumstances now relied on as suspicious, explained to the defendants and explained to their satisfaction?" The answer is found in the defendant's action. Again it is asked: "Didn't they say, after hearing the explanations, that they had the utmost confidence in Dr. Moore?" The testimony upon this point is as follows: Mr. Moore says that he told defendant Brown that the property had been sold; that

he did not ask him where the money was; told him that the running capital had been practically run out of the business on account of the suit; that they had to increase the capital some way or the mill had to shut down. "Mr. Brown told you he had always been your father's friend in his business? Yes, sir. Let him have this money to be used in conducting his business? Yes, sir, had the utmost confidence in him. And when he told him he was his friend he was? Yes, sir. Said he had the utmost confidence in him."

We do not construe this language as plaintiff does. To our minds it is rather the language of a man more disappointed in the conduct of one to whom he had extended credit because of his confidence and friendship. This language must be interpreted in the light of time, place and circumstances. Here was the cashier of a bank, who had for two years been renewing and increasing a loan to his friend without security to enable him to carry on his business. When he goes to see him for the purpose of securing his debt, the debtor has sold off property of large value, as it afterwards turns out $8,000, shut down the mill, permitted the insurance to expire and gone to a distant State, leaving his son, a young student, just from college, in charge. Certainly his statement that he had trusted and had reposed confidence in plaintiff does not show a state of mind inconsistent with his action taken shortly thereafter. That Brown was anxious about the debt is evident from his actions, as well as his words. Plaintiff was put upon notice that the bank desired payment, and was urgently pressing for payment; that it had rejected his proposition. To take the most favorable view of his conduct, was it not folly on his part to leave the State under the circumstances known to him; was not his entire conduct well calculated to cause his creditors to reasonably apprehend that their debts were in jeopardy. The plaintiff says that the dissolution of the attachment shows an absence of probable cause. Whatever effect such order would have had if made upon the

merits, it is not necessary to discuss, because the order was made upon plaintiff's payment of the debt. No other course was open to the court or the defendant bank. The fact that plaintiff returned on Monday following the attachment and paid the debt cannot be considered on the question of probable cause, nor can the fact that plaintiff caused the proceeds of the personal property, including the manufactured goods in the mill which he had sold, amounting to $8,000 to be deposited in the bank in Cincinnati to the credit of his nephew, Dr. Payne. "If by his folly or his fraud the plaintiff exposed himself to a well grounded suspicion that he was guilty of the crime of which he was charged, he cannot claim that there was not probable cause for the prosecution." 19 Am. & Eng. Enc. (2 Ed.), 659. The examination of the cases in our own and other reports shows that the courts have, with practical uniformity, held that when the facts are admitted, as by a demurrer to the evidence, the question of probable cause has been decided as a matter of law. When the testimony is conflicting, the court instructs the jury as to the law, leaving to them to find the truth of the matter by applying the law to the facts as they find them to be. *Mr. Justice Hunt,* in *Stacey v. Emery, supra,* says: "The question of malice or good faith is not an element in the case. It is not a question of motive. If the facts and circumstances before the officer are such as to warrant a man of prudence and caution in believing that the offense has been committed, it is sufficient. Whether the officer seized the occasion to do an act which would injure another, or whether he moved reluctantly is quite immaterial."

In *Williard v. Holmes,* 142 N. Y., 492, *Gray, J.,* in discussing the law in regard to suing out an attachment, says: "It was a process which the statute authorized and which is usual in such cases, and its use subjects this defendant to no unfavorable criticism, if it accompanied the institution of an honest suit." He further says: "The circumstances to sustain

this right of action must appear to have been such that no reasonable man could have been influenced thereby to the belief that the plaintiff had unauthorizedly committed the company, whose officer he had been, to a liability which it had not incurred and which was foreign to its chartered purposes. It is our judgment that the facts did not justify the trial court in submitting the case to the jury and that, upon all the evidence, it was error to deny the defendant's motion to dismiss the complaint. The material facts were not in dispute, and whether there was probable cause for the prosecution of the former action became a question of law solely for the court." The law is discussed in the case of *Stewart v. Sonneborn,* 98 U. S., 187. The authorities are reviewed in an able opinion by *Mr. Justice Strong.*

The plaintiff strongly urges upon our attention the fact that he owned a large quantity of real estate of large value. In this action we do not perceive that this fact is material upon the question of probable cause. If the defendant had such cause to believe that plaintiff was disposing of his property to defraud his creditors, or had left the State for that purpose, the value of his property was of no moment. He could as easily dispose of a large quantity by conveyance as a small quantity. A very wealthy man, whose conduct is such as to give to his creditors probable cause to sue out an attachment, is in no better position in that respect than a man with small means. That defendant was seriously apprehensive in regard to its debt is shown by the testimony of plaintiff's son. If this were an action for abuse of process by levying the attachment upon property of value largely in excess of the debt or otherwise using the process oppressively, the testimony in respect to the value of the property would be material. *Railroad Co. v. Hardware Co.,* 138 N. C., 174.

Upon a careful examination of the entire record, we find no error in His Honor's judgment.

No Error.